**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICK OF VIRGINIA**
**Norfolk Division**

**JENNIFER ARTHUR,**

        **Plaintiff,**

v.                                                          **Civil Action No. 2:19-cv-186**

**ANDREW SAUL,**
**Commissioner of Social Security,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff Jennifer Arthur ("Plaintiff" or "Arthur") seeks judicial review of the Commissioner of Social Security's ("Defendant" or "Commissioner") decision denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act. Arthur claims that: (1) the Administrative Law Judge ("ALJ") impermissibly relied upon a reasonable accommodation in determining whether Arthur can perform any work existing in significant numbers in the national economy; (2) the ALJ did not meet his burden in proving that Arthur's acquired work skills were transferable to other jobs with little to no vocational adjustment; and (3) the ALJ was not properly appointed under the Appointments Clause of the United States Constitution and thus lacked legal authority to preside over Arthur's claim.

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B), and Rule 72(b) of the Federal Rules of Civil Procedure. This report concludes that the ALJ's decision is supported by substantial evidence and that Plaintiff has forfeited her Appointments Clause challenge. I thus recommend that the court affirm the final decision of the Commissioner.

## I.    Procedural Background

Arthur protectively filed applications for DIB and SSI on November 24, 2014, alleging disability since February 9, 2013, due to the following conditions: congestive heart failure; chronic back, hip, and shoulder pain; type 2 diabetes; depression; and sleep apnea.[1]  (R. at 133-34, 142-43, 278-85, 308.)  The Commissioner denied her applications initially on May 8, 2015, (R. at 133-52), and again on reconsideration, (R. at 153-77).  Arthur requested an administrative hearing before an ALJ, which took place on June 14, 2017.  (R. at 41-106, 211-213.)  She appeared at the hearing represented by counsel.  (R. at 41-106.)

In a written opinion issued on November 13, 2017, the ALJ determined that Arthur was not disabled within the meaning of the Social Security Act and denied her applications for DIB and SSI.  (R. at 10-27.)  On September 27, 2018, the Appeals Council denied Johnson's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (R. at 1-4.)  Arthur timely filed this action, seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  This case is now before the court to resolve the parties' cross-motions for summary judgment, ECF Nos. 16 (Plaintiff), 18 (Defendant).

## II.    Factual Background[2]

Arthur was fifty-five years old when she filed for disability benefits, (R. at 133, 142), and sixty-two years old at the time the ALJ rendered his decision, (R. at 52-53).  She holds a bachelor's

---

[1] Arthur previously applied for DIB and SSI in September 2011.  (R. at 11, 107-26, 134, 143, 313-14.)  An ALJ denied those applications on February 8, 2013, and the Appeal Council denied review on May 30, 2014.  (R. at 107-32.)  In the present applications, Arthur initially listed an alleged onset date of November 24, 2010, (R. at 44, 134, 143), but she later amended that date to February 9, 2013, the day after the first ALJ's hearing decision, (R. at 71, 308).

[2] The parties agree that, due to the nature of the issues presented in this case, a detailed description of the record is unnecessary; thus, I dispense with a lengthy recitation of Arthur's medical history.

2

degree in sociology from Norfolk State University.  (R. at 54-55, 318.)  She testified that she lives with her daughter in an apartment.  (R. at 54.)  Prior to filing, she worked as a case manager (2007-2009) and a counselor (1994-2007).  (R. at 318.)  In the former position, Arthur worked with individuals ("clients") with mental health issues, including post-traumatic distress order, to help them apply for and obtain benefits.  (R. at 63, 309.)  She visited her clients in their homes to check in on them and to ensure that they were taking their medication; she also took her clients shopping and to medical appointments.  (R. at 63, 309.)  She used a computer to create daily, weekly, and monthly reports.  (R. at 309.)  Arthur also testified that she supervised three individuals.  (R. at 63.)

As a counselor, Arthur led group sessions, resolved conflicts, and prepared notes and weekly reports.  (R. at 66, 310.)  She testified that she had fifteen clients and would see at least two a day.  (R. at 67.)  She drove to her clients' homes to visit them and assisted them with budgeting, grocery shopping, sometimes cooking and cleaning.  (R. at 66-68, 310.)  She also testified that she drove clients to the Social Security office to help them apply for benefits.  (R. at 68.)

Arthur also testified that she volunteers at least twice a month to read to children at a local elementary school.  (R. at 55-57.)  Arthur does not have a vehicle, so her daughter usually drives her.  (R. at 55, 57.)  In her spare time, Arthur enjoys reading books on her Kindle or, less often, at the library, stating that reading helps her focus.  (R. at 58-59, 77-78.)  She requires large text, which her Kindle is able to accommodate.  (R. at 58, 77.)

A Vocational Expert ("VE") also testified at the ALJ hearing.  (R. at 90-102.)  According to the VE, both of Arthur's past jobs were listed as sedentary, skilled, but he considered it "light

3

as performed" due to Arthur's fieldwork.[3]  (R. at 91-92.)  The ALJ then posed a hypothetical to

the VE, asking whether a person with Arthur's age, education, and work experience could perform

any sedentary level of activities, but with several functional limitations.  (R. at 92-93.)  The ALJ

also afforded Arthur's attorney an opportunity to respond to those limitations and propose

modifications.  (R. at 93-94.)  Based on the attorney's comments, including evidence of Arthur's

blurry vision, the ALJ slightly modified the hypothetical and added the limitation of no "fine visual

acuity."  (R. at 94-97.)

Considering the ALJ's RFC, the VE testified that the hypothetical person would not be

able to perform any of Arthur's past jobs, primarily due to the field work and the need for fine

visual acuity.  (R. at 97.)  In response, the following exchange between the ALJ, VE, and Arthur's

attorney ensued:

> [ALJ:]    Well, just to make sure I understand, fine visual acuity would not
> preclude reading, does that preclude reading as you understand it?
>
> [VE:]    I consider fine visual acuity reading.  If you -- if a person -- when you
> say no -- no is pretty absolute, when you say no fine visual acuity, I interpret that
> as -- I take that as no reading.  If you say reading, you can say limited or you can
> [say] some other word, but if you say no, that cuts out reading you can say large
> print, you can say you know, like computer work, you can blow it up, there's things
> that if you can read with a large print or if you can -- or whatever, but the –
>
> ALJ:    And, Counsel, what I'm going to do is I'm going to retain that limitation
> as stated, since it's what you had asked for, but for my purposes, because we have
> testimony that she is able to read, and does read, in fact reads to kids and I realize
> it's a little bit larger --
>
> ATTY:    Yes.

---

[3] Sedentary work involves lifting no more than ten pounds at a time and mostly involves sitting,
but it can also require a certain amount of walking and standing. 20 C.F.R. §§ 404.1567(a),
416.967(a).  Light work, on the other hand, involves lifting up to twenty pounds and typically
involves a good deal of walking or standing, or when it involves sitting most of the time with some
pushing and pulling of arm or leg controls. 20 C.F.R. §§ 404.1567(b), 416.967(b).

ALJ:     -- books, usually with kids reading, we certainly don't have finding of blindness and it is not my intent to say that she cannot read.

ATTY:    No, nor is it my intent to submit that. My intent is to submit that her reading is at large print.

ALJ:     Okay. Then what if I said limited to jobs that have the opportunity to read at large -- larger than normal print, which is 12. Font usually.

ATTY:    And if that's, yeah, I'm fine with that.

ALJ:     Okay. So, able to read only documents larger print, which is 12. Font.

(R. at 97-98.) The VE indicated that he understood the modification. (R. at 98-99.)

The ALJ then asked the VE whether there were any examples of semiskilled or skilled jobs in the national economy that "Arthur might be able to hypothetically perform in which her actual past work skills would be sufficient to permit the now jobs with no more than very little, if any adjustment in terms of tools used, work processes, working settings or industry standards." (R. at 99.) The VE responded in the affirmative and testified,

> The skills would involve counseling skills, communication skills, some problem resolution skills, basic computer skills, office skills and procedures, report writing and record keeping. Some job examples would be a sedentary, semiskilled, SVP 4, information clerk, the [Dictionary of Occupational Titles ("DOT")] Code is 237.367-022, I'll reduce my numbers to 48,000 and I did that on the combination of the larger than normal size print; another job example would be a sedentary, semiskilled, SVP 3, it's a non-sales telephone clerk, an example of the job would be like a phone answering service operator, that DOT Code is 235.662-026 and the numbers are 18,000 nationally; I have -- there are some other jobs, I'm eliminating those based on the combination of factors of larger than normal size print. . . . A third would be a scheduler or appointment clerk, the appointment clerk's DOT code is 237.367-010, national numbers are 121,000. . . . It's a semiskilled, 3, SVP 3.

(R. at 100.)

The ALJ then asked the VE, "If any of my past limitations conflicted with or [are] different from or additional to those used in the <u>Dictionary of Occupational Titles</u>, were your answers based on your specialized training and experience and still within our expert qualification in this case?"

5

(R. at 100-01.)  The VE replied, "Yes, sir."  (R. at 101.)  The ALJ then permitted Arthur's counsel to cross-examine the VE.  (R. at 101.)  Arthur's counsel inquired only about the frequency of interaction with others (e.g., co-workers, supervisors, and the general public) and the tolerance for being off task.  (R. at 101-02.)  Finally, the ALJ gave Arthur an opportunity to make a statement before adjourning the hearing.  (R. at 104-06.)

### III.   Legal Standard

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence in the record and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence but may be somewhat less than a preponderance.  Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456.  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)."  Craig, 76 F.3d at 589.  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed.  Perales, 402 U.S. at 390.  Thus, reversing the denial of benefits is appropriate

only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law.  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. Recommended Conclusions of Law

In determining whether the claimant qualifies for DIB and SSI under the Social Security Act, see 42 U.S.C. §§ 423, 1382c, the ALJ follows a five-step process established by the Social Security regulations.  20 C.F.R. §§ 404.1520(a), 416.920(a); accord Kenedy v. Saul, 781 F. App'x 184, 186 (4th Cir. 2019) (per curiam).  At step one, the ALJ must determine whether the claimant is involved in substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If she is, the claimant is not disabled.  At step two, the ALJ asks whether the claimant suffers from a severe medical impairment or combination of impairments that significantly limit her physical or mental ability to do work activities.  §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If she does not, the claimant is not disabled.  Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment").  §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the answer is yes, the claimant is disabled.  If the answer is no, the ALJ must assess the claimant's residual functional capacity ("RFC"), which accounts for the most the claimant can do despite her physical and mental limitations, before proceeding to the next step.  See §§ 404.1545, 416.945.  At step four, the ALJ determines whether the claimant can perform her past work given her RFC.  §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If she can, she is not disabled.  If she cannot, the ALJ continues to the final step and asks whether the claimant can perform any work existing in the national economy.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  A negative answer establishes disability.  However, an affirmative answer results in a finding of no disability.

The burden of proof and production rests on the claimant during the first four steps but shifts to the Commissioner at the fifth step. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)). At all steps, the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d 1456. Additionally, when conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses and expert medical opinions of treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age. Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)).

## A.    The ALJ's Decision

In this case, the ALJ issued a written opinion, finding that Arthur did not qualify as disabled under the Social Security Act. (R. at 10-27.) In arriving at this conclusion, the ALJ employed the five-step analysis set out above. At step one, the ALJ found that Arthur had not engaged in substantial gainful activity since her alleged onset date of February 9, 2013. (R. at 14.) At step two, the ALJ concluded that Arthur had the following severe impairments: degenerative disc disease and osteoarthritis; carpal tunnel syndrome; asthma; diabetes with neuropathy; macular edema and retinopathy; and congestive heart failure. (R. at 14.) At the third step, the ALJ determined that Arthur did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (R. at 15-16.)

Next, the ALJ found that Arthur had the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), subject to the following:

> [T]he claimant cannot crawl or climb ladders, ropes or scaffolds, but she can climb ramps and stairs, stoop, kneel, and crouch occasionally. The claimant retains the ability to balance frequently. She can finger objects with either hand frequently. The claimant can perform work activities that do not require her to move while at

unprotected heights, or operate moving mechanical parts that pose an immediate hazard or danger. The claimant is able to have no more than frequent exposure to dust, odors, fumes, gases or pulmonary irritants, extreme heat, and vibration. The claimant is able to read only larger than normal sized print documents. The claimant can frequently, but not always, push or pull with lower extremities due to edema. The claimant must be allowed to occasionally alternate between sitting and standing positions wile at the workstation. The claimant is expected to be off-task up to 5% of the time in an 8-hour workday. The claimant has the ability to perform work activities that allow her to use a cane for walking.

(R. at 16.) The ALJ found that the record evidence established the existence of medically determinable impairments that could reasonably cause Arthur's alleged symptoms, namely, lower extremity, back, and wrist pain, as well as vision problems and shortness of breath/fatigue; however, he concluded that "the record does not support the degree of functional limitation the claimant reports." (R. at 17.)

Given Arthur's RFC, the ALJ concluded that Arthur was unable to perform any of her past relevant work. (R. at 21.) However, considering Arthur's age, education, and past relevant work, the ALJ found that Arthur had "acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy." (R. at 21-22). As a result, the ALJ made a finding of no disability. (R. at 22-23.)

Arthur advances three arguments for why the court should vacate the Commissioner's decision and remand for a new hearing and decision. The first two arguments deal with the fifth step of the ALJ's disability assessment. According to Plaintiff, the ALJ erred by considering a reasonable accommodation – specifically, the ability to read only large print – when determining the availability of any jobs in the national economy. Pl.'s Br. Supp. Mot. Summ. J. ("Pl.'s Br.") 2-3 (ECF No. 17). Second, Arthur claims that the ALJ failed to carry its burden in proving that her acquired work skills were readily transferable to a significant range of light work activity and that the three occupations the ALJ identified required very little vocational adjustment. Id. at 3-8.

Finally, Arthur argues that the ALJ was not properly appointed under the Appointments Clause and thus lacked the legal authority to preside over the case. Id. at 8-12. As explained below, I disagree with Arthur's arguments and thus recommend that the court affirm the final decision of the Commissioner.

## A.  Substantial Evidence Supports the ALJ's Step Five Analysis

1.  The ALJ did not err in relying on the VE's testimony because the VE did not assume that Plaintiff would receive a "reasonable accommodation" under the Americans with Disability Act.

Plaintiff first argues that the ALJ erred in relying on a reasonable accommodation in determining whether she could perform any jobs in the national economy. According to Plaintiff, under "black and white" Social Security policy, the ALJ is not permitted to consider potential accommodations by employers in determining the availability of jobs at step five. Pl.'s Br. 2. But in this case, the ALJ included in his hypothetical to the VE a limitation of being able to read only larger than normal size font, (R. at 94, 97-100), which the United States Equal Employment Opportunity Commission ("EEOC"), according to Plaintiff, deems a reasonable accommodation under the Americans with Disabilities Act ("ADA"), Pl.'s Br. 2. Consequently, the argument goes, the court must remand for a new hearing and decision.

Plaintiff relies on the Supreme Court's decision in Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795 (1999), and SSR 00-1c, 2000 WL 38896 (Jan. 7, 2000). Pl.'s Br. 2. In Cleveland, the Supreme Court was called upon to resolve apparent tension between the Social Security Act and the ADA. Cleveland sought Social Security benefits after suffering a stroke. 526 U.S. at 798. Her condition improved, so she returned to work and reported it to the SSA. Id. Based on this information, the SSA denied her claim for benefits. Id. Cleveland's employer then terminated her based on her condition. Id. In response, Cleveland asked the SSA to reconsider her claim for

10

benefits, which was denied.  Id. at 798-99.  However, after a hearing, Cleveland was granted benefits.  Id. at 799.  One week before she was granted benefits, however, Cleveland filed an ADA claim against her employer, contending that it failed to reasonably accommodate her disability.  Id.; see also 42 U.S.C. § 12111(9) (defining "reasonable accommodation").  The lower courts found for the employer, concluding that by seeking and receiving Social Security benefits, Cleveland had conceded total disability, and thus could not perform the essential functions of her job even with reasonable accommodations.  526 U.S. at 799-800.

The Supreme Court unanimously reversed, finding that a Social Security claim and ADA claim "can comfortably exist side by side."  Id. at 803-06.  Critical to the Court's holding was that under the ADA, a qualified individual is one who can "perform the essential functions of her job with reasonable accommodation"; but "when the SSA determines whether an individual is disabled . . . it does not take the possibility of reasonable accommodation into account."  Id. at 803 (internal quotation marks and citations omitted).  Consequently, "an ADA suit claiming that the plaintiff can perform her job with reasonable accommodation may well prove consistent with an SSDI claim that the plaintiff could not perform her own job (or other jobs) without it."  Id.

In response to Cleveland's holding, the SSA issued SSR 00-1c, which simply reiterates that a person who files for disability under the Social Security Act is not automatically precluded from pursuing an ADA claim.  SSR 00-1c.  The SSA later issued SSR 11-2p, which states, "When we determine whether a person can do other work that exists in significant numbers in the national economy, we do not consider whether he or she could do so with accommodations, even if an employer would be required to provide reasonable accommodations under the [ADA]."  SSR 11-2p, 2011 WL 4055665, at *9 (Sept. 11, 2011).

Thus, Plaintiff is correct that the ALJ is not entitled to consider the possibility of accommodation by employers when assessing the availability of jobs in the national economy that a claimant can perform. <u>See</u> <u>Cleveland</u>, 526 U.S. at 803; SSR 11-2P; <u>see also</u> <u>Jones v. Apfel</u>, 174 F.3d 692, at 693 (5th Cir. 1999) ("[A] vocational expert should not base his determination of the availability of jobs on the assumption that the ADA requires an employer to accommodate an individual's disability."). Even Defendant does not contest this fact. But Defendant argues, and I agree, that the ALJ did no such thing here.

In this case, the ALJ, <u>at the behest of Arthur's counsel</u>, instructed the VE, in opining on the availability of jobs Arthur could perform, to consider the limitation of being able to read only larger than normal-sized print. (R. at 16, 94, 97-98.) In doing so, and importantly, the ALJ did <u>not</u> ask the VE to assume that Arthur would receive reasonable accommodations under the ADA. Nor did the VE mistakenly believe the hypothetical required such an assumption. Indeed, in identifying the three jobs that he believed a hypothetical person with Arthur's limitations could perform, the VE testified that such jobs already accounted for the reading size limitation – that is, the hypothetical person could perform the job <u>without</u> any reasonable accommodations. (R. at 99-100 (reducing the number of available jobs in response to the reading size limitation)); <u>see</u> Def.'s Mem. 11 ("The VE's testimony considered jobs that already allowed for large print to perform the tasks, rather than jobs that do not specifically allow for large print but, with reasonable accommodation of large print, would provide for an employee to continue working at a specific job."). That the EEOC might, as Plaintiff states, consider "[t]he need for large print . . . a reasonable accommodation under the ADA," Pl.'s Br. 2, does not alter the analysis because the VE's testimony was not contingent on potential employers providing any reasonable

accommodations.  See Collins v. Berryhill, No. 3:17-cv-633, 2018 WL 8232888, at *8 (E.D. Va.

Aug. 20, 2018), R. & R. adopted, 2018 WL 4224854 (E.D. Va. Sept. 5, 2018).[4]

Several courts have noted this subtle but critical distinction. See, e.g., Eback v. Chater, 94

F.3d 410, 412 (8th Cir. 1996) (vacating ALJ's decision where ALJ relied on VE testimony that

assumed potential employer would be required to reasonably accommodate under the ADA);

Belcher v. Berryhill, No. 6:17-cv-53, 2018 WL 3621211, at *5 (S.D. Tex. June 22, 2018) ("When

the ALJ questioned the VE on an employee's ability to sit or stand during the workday in the jobs

she listed, he did so to determine if it was a normal part of the job consistent across all employers,

not as a reasonable accommodation."); Higgins v. Berryhill, No. 4:16-cv-885, 2017 WL 2501592,

at *3-4 (E.D. Mo. June 9, 2017) (noting that "the VE properly focused on whether positions with

the necessary accommodations were sufficiently available in the national economy" without regard

to whether a "specific employer's practices"); Titus v. Astrue, No. 1:11-cv-1286, 2012 WL

3113165, at *12-13 (N.D. Ohio June 12, 2012) ("The VE never suggested that the hypothetical

individual might require a 'reasonable accommodation' in order to perform the work or that she

assumed an employer would be willing to make such accommodations.  Nor did she testify that

the hypothetical individual's employability was contingent on whether an employer was willing

to make an accommodation. Instead, the VE identified three jobs that the hypothetical individual

---

[4] In Collins and in Revere v. Berryhill, No. 3:17-cv-774, 2019 WL 99303 (E.D. Va. Jan. 3, 2019),
Judge Novak found that SSR 00-1c does not "state, or even suggest, that the inclusion of a
'reasonable accommodation' in an ALJ's hypothetical question renders that hypothetical invalid."
2018 WL 4232888, at *8; 2019 WL 99303, at *6. I do not interpret Judge Novak's statements to
mean that the ALJ may rely on VE testimony that assumes the probability of a reasonable
accommodation under the ADA, but rather that nothing prevents an ALJ from including in his
hypothetical to the VE limitations that, in the abstract, might also be considered a reasonable
accommodation under the ADA. See Revere, 2019 WL 99303, at *6 (noting that "the Fourth
Circuit has recognized the validity of including restroom-access requirements in hypotheticals
posed to VEs"); Collins, 2018 WL 4232888, at *8 (observing that the Fourth Circuit has
"consistently" allowed ALJs to "include the sit/stand option in their hypotheticals" to VEs).

could perform, taking into account the need to use a cane."); Eaglebarger v. Astrue, No. 1:11-cv-38, 2012 WL 602022, at *6 (N.D. Ind. Feb. 23, 2012) ("[T]he VE never suggested that this hypothetical individual might require a 'reasonable accommodation' in order to perform the work or that she assumed an employer would be willing to make such accommodations.").

Here, the ALJ appropriately included the reading size limitation in his hypothetical to the VE. Indeed, courts in the circuit have upheld RFC determinations that included similar reading size limitations. See, e.g., Williams v. Colvin, No. 6:13-cv-2907, 2015 WL 628504, at *6, *13 (D.S.C. Feb. 12, 2015) (adopting report and recommendation). And the record conclusively demonstrates that the three occupations identified by the VE were not contingent on reasonable accommodations under the ADA. Thus, the ALJ did not err in relying on the VE's testimony in this respect during his step five analysis.

2.    Substantial Evidence Supports the ALJ's Conclusion that Plaintiff Could Perform the Duties of an Information Clerk and an Appointment Clerk.

Plaintiff further argues that the ALJ did not meet his burden in demonstrating that Plaintiff could perform jobs existing in significant numbers in the national economy because (1) the jobs identified by the VE include requirements that do not comport with the ALJ's RFC determination, and (2) the ALJ failed to demonstrate that Plaintiff's past work skills were readily transferable to a significant range of light work activity and that the identified occupations required very little if any vocational adjustment. I address each in turn.

a.    Two of the three jobs identified by the VE do not conflict with the ALJ's RFC.

Plaintiff argues that the ALJ erred in relying on the VE's testimony because the requirements of the three occupations listed by the VE – information clerk (DOT 237.367-022), telephone clerk (DOT 235.662-026), and appointment clerk (DOT 237.367-010) – conflict with the RFC crafted by the ALJ. I agree only with respect to the telephone clerk position.

14

Under SSR 00-4p, the ALJ "has an affirmative reasonability to ask [the VE] about any possible conflict between [his] evidence and . . . the DOT." 2000 WL 1898704, at *4 (Dec. 4, 2000). The ALJ must "obtain a reasonable explanation for [any] apparent conflict." Id. However, the ALJ also has an independent obligation to identify and resolve any conflict before relying on the VE's testimony, and he must explain the resolution of such conflicts in his decision. Id.; see also Thomas v. Berryhill, 916 F.3d 307, 313-14 (4th Cir. 2019); Pearson v. Colvin, 810 F.3d 204, 208-10 (4th Cir. 2015). The Fourth Circuit has explained that a conflict is "apparent" when the VE's testimony "seems to, but does not necessarily, conflict with the express language of the DOT—even if the conflict is not obvious." Thomas, 916 F.3d at 313 (internal quotation marks omitted) (quoting Pearson, 810 F.3d at 209). Thus, in Pearson, the Fourth Circuit found an apparent conflict when the ALJ limited the claimant to only occasional overhead reaching, but the VE testified that the claimant could perform jobs that the DOT listed as requiring frequent reaching. 810 F.3d at 210-11 ("Although the Dictionary does not expressly state that the occupations identified by the expert require frequent bilateral overhead reaching, the Dictionary's broad definition of 'reaching' means that they certainly may require such reaching.").

In this case, the ALJ did not expressly ask the VE whether his testimony conflicted with the DOT. Rather, he asked only, "If any of my past limitations conflicted with or [are] different from or additional to those used in the Dictionary of Occupational Titles, were your answers based on your specialized training and experience and still within our expert qualification in this case?" (R. at 100-01.) Further, in his written opinion, the ALJ summarily stated, "Pursuant to SSR 00-4p, I have determined that the vocation expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." (R. at 22.)

According to Plaintiff, however, the VE's testimony conflicts with the DOT in two ways. First, each of the jobs identified by the VE require frequent near visual acuity. Pl.'s Br. 2-3. Second, the telephone clerk position requires constant fingering. Id. at 3.

Beginning with Plaintiff's second argument, I agree that the VE's testimony conflicts with the DOT, and the ALJ failed to address, much less resolve, that conflict. In his RFC, the ALJ unambiguously stated that Arthur could only finger objects with either hand frequently. (R. at 16, 92.) However, the description for the telephone clerk position identified by the VE (DOT 235.662-026) clearly requires constant fingering. DOT 235.662-026, 1991 WL 672176. The ALJ thus erred in not identifying and resolving this conflict, in violation of SSR 00-4p. See Pearson, 810 F.3d at 208-11. The Commissioner does not argue otherwise. See Def.'s Mem. 16.

However, remand is not warranted if substantial evidence supports the ALJ's finding that Arthur could perform either of the other two jobs identified by the VE – information clerk and appointment clerk. Indeed, the Commissioner need only establish that "there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications." 20 C.F.R. §§ 404.1566(b), 416.966(b) (emphasis added); (R. at 100 (noting 48,000 jobs were available nationally as an information clerk and 121,000 jobs were available nationally as an appointment clerk)); see also Dyrdra v. Colvin, 47 F. Supp. 3d 318, 326 (M.D.N.C. 2014) (noting that "remand is not appropriate unless the claimant was prejudiced." citing Morgan v. Barnhart, 142 F. App'x 716, 724-25 (4th Cir. 2005)). Thus, remand is required only if Arthur persuades the court that the VE's testimony conflicts with the DOT listings for the other two jobs identified by the VE.

Plaintiff contends that the VE's testimony conflicts with the DOT regarding the other two jobs– information clerk and appointment clerk – because those jobs "require frequent near visual

16

acuity." Pl.'s Br. 2-3. Although Plaintiff is correct that those two jobs require frequent near acuity, see DOT 237.367-022, 1991 WL 672188 (information clerk); DOT 237.367-010, 1991 WL 672185 (appointment clerk), the ALJ did not ultimately limit Arthur to jobs with no near/fine visual acuity. Indeed, the ALJ initially instructed the VE to not consider jobs that require fine visual activity, (R. at 94), but he later expressly altered that limitation to the ability to read only larger than normal-sized print, with Plaintiff's counsel's endorsement, (R. at 97-98). Plaintiff appears to recognize this fact in her Reply, arguing that the DOT descriptions for those jobs do not "indicate that these occupations are performed with large print." Pl.'s Reply 3 (ECF No. 20).

Nonetheless, to the extent that frequent near vision acuity conflicts, or appears to conflict, with the VE's testimony that Arthur could perform the duties of information clerk and appointment clerk in light of the ALJ's limitation of being able to read only larger than normal-sized text, the ALJ adequately resolved that conflict during the hearing. Indeed, the VE testified that he interpreted "no fine visual acuity" as precluding reading. (R. at 97-98.) However, in light of the record evidence regarding Arthur's ability to read, the ALJ explicitly stated that it was "not [his] intent to say that she cannot read." (R. at 98.) Arthur's attorney replied, "No, nor is it my intent to submit that. My intent is to submit that her reading is at large print." (Id.) Thus, the ALJ explicitly limited Arthur to "jobs that have the opportunity to read at . . . larger than normal print." (Id.) Arthur's attorney expressed his agreement with that limitation. (Id.) The ALJ ensured that the VE understood this modified limitation, and only after that did the VE identify the three jobs. (R. at 98-100.) And the VE explicitly referred to the reading size limitation when discussing those jobs. (R. at 100.) Clearly, the VE did not deem those jobs' requirement of frequent near acuity inconsistent with the ALJ's reading size limitation. Moreover, Arthur's attorney did not raise this issue on cross-examination. I am thus satisfied that the ALJ's reliance on the VE's testimony in

this regard was proper, and I find such testimony substantial evidence to support the ALJ's conclusion that Arthur could perform these jobs.

  b. <u>Substantial evidence supports the ALJ's transferability determination.</u>

  Plaintiff also argues that the ALJ failed to satisfy his burden in demonstrating that Plaintiff's acquired work skills were readily transferable to a significant range of light work activity and that the jobs identified by the VE required very little, if any, vocational adjustment. Pl.'s Br. 3-8.  Not surprisingly, the Commissioner disagrees. <u>See</u> Def.'s Mem. 11-16.

  At step four, the Commissioner must determine whether the claimant, given her RFC, is capable of performing any of her past work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1560(b), 416.920(a)(4)(iv), 416.960(b).  If the Commissioner finds that she cannot perform any past work, the analysis proceeds to the fifth step, and the Commissioner bears the burden of producing evidence that demonstrates that the claimant can nonetheless perform other jobs existing in significant numbers in the national economy.  §§ 404.1512(b)(3), 404.1520(a)(4)(v), 404.1560(c), 416.912(b)(3), 416.920(a)(4)(v), 416.960(c).

  To assess whether the claimant can perform other work, the ALJ takes into account the transferability of the claimant's acquired work skills:  "We consider you to have skills that can be used in other jobs, when the skilled or semi-skilled work activities you did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work."  §§ 404.1568(d)(1), 416.968(d)(1); <u>see also</u> SSR 82-41, 1982 WL 31389, at *2 (Jan. 1, 1982) ("Transferability means applying work skills which a person has demonstrated in vocationally relevant past jobs to meet the requirements of other skilled or semiskilled jobs.").  Normally, the Commissioner will find skills transferable to jobs that (1) require the same or lesser degree of skill, (2) use the same or similar tools and machines, and/or (3) involve the same or

similar raw materials, products, processes, or services.   20 C.F.R.   §§ 404.1568(d)(2); 416.968(d)(2).  "There are degrees of transferability of skills ranging from very close similarities to remote and incidental similarities among jobs.  A complete similarity of all three factors is not necessary for transferability."  §§ 404.1568(d)(3); 416.968(d)(3).  At bottom, "the higher the skill level, the more the potential for transferring skills increases."  SSR 82-42, 1982 WL 31389, at *4; see also id. at *5 ("Generally, the greater the degree of acquired work skills, the less difficulty an individual will experience in transferring skills to other jobs except when the skills are such that they are not readily usable in other industries, jobs and work settings.").

The Social Security regulations provide special rules that apply when determining the transferability of skills for "persons of advanced age" – that is, persons at least fifty-five years old. More specifically, and as relevant here,

> If you are of advanced age and you have a severe impairment(s) that limits you to no more than sedentary work, we will find that you have skills that are transferable to skilled or semiskilled sedentary work only if the sedentary work is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry.[5]

_____

[5] These regulations also provide,

> If you are closely approaching retirement age (age 60 or older) and you have a severe impairment(s) that limits you to no more than light work, we will find that you have skills that are transferable to skilled or semiskilled light work only if the light work is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry.

§§ 404.1568(d)(4); 416.968(d)(4) (emphasis added).  Although Plaintiff, aged sixty-two at the time of the ALJ's decision, is properly classified as "approaching retirement age" – a fact recognized by the ALJ, (R. at 21) – these particular provisions technically do not apply to Arthur as she is limited to sedentary work, (R. at 16).  Nonetheless, they require the same standard as the provisions related to persons of advanced age limited to sedentary work – the proposed work must be so similar to past work such that the claimant "would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry."  §§ 404.1568(d)(4); 416.968(d)(4).

20 C.F.R. §§ 404.1568(d)(4); 416.968(d)(4); see also SSR 82-41, 1982 WL 31389, at *5 ("To find that an individual who is age 55 or over and is limited to sedentary work exertion has skills transferable to sedentary occupations, there must be very little, if any, vocational adjustment required in terms of tools, work processes, work settings or the industry.").

"Skills, levels of skills and potential occupations to which skills from [past relevant work] may be transferred are for the adjudicator or ALJ to determine (with the assistance, when required, of a VS or occupational reference sources)." SSR 82-41, 1982 WL 31389, at *4; see also Hall v. Harris, 658 F.2d 260, 267 (4th Cir. 1981) (stating that in determining the transferability of the claimant's acquired work skills, the ALJ "may, and ordinarily should require the testimony of a vocational expert"). "When a finding is made that a claimant has transferable skills, the acquired work skills must be identified, and specific occupations to which the acquired work skills are transferable must be cited in the . . . ALJ's decision." SSR 82-41, 1982 WL 31389, at *7.

In this case, the VE testified that, in light of the ALJ's RFC, Arthur could not perform any of her past work, (R. at 97), and the ALJ, relying on the VE's testimony, concluded the same in his written decision, (R. at 21.) Thus, the burden shifted to the Commissioner to demonstrate that Arthur is able to perform other work. To do that, the ALJ had to identify Arthur's acquired work skills, as required by SSR 82-41. And the ALJ did so in his written opinion:

> Mr. Edwards, the vocational expert, testified that the claimant's past relevant work as case manager/case worker and family counselor were skilled with a specific vocational preparation (SVP) code of 7 and required the following skills: communication, counseling skills, problem resolution, office skills [and] procedures, report writing and record keeping. He noted that these skills could transfer to jobs within the claimant's residual functional capacity.

(R. at 21.) Then, considering Arthur's age, education, RFC, and prior work experience in conjunction with the Medical-Vocational Guidelines, as well as the VE's testimony that Arthur's previous jobs were so similar to the identified jobs that she "would need to make very little, if any,

vocational adjustment in terms of tools, work processes, work settings, or the industry," the ALJ concluded that Arthur had acquired work skills that were transferable to other jobs existing in significant numbers in the national economy. (R. at 22, 99-100.) In doing so, the ALJ noted that Arthur's "additional limitations do not allow [her] to perform the full range of sedentary work." (R. at 22.) But he nonetheless concluded that a finding of no disability was appropriate based on all the factors in this case. (Id.)

Plaintiff claims that "the remaining two occupations to which skills supposedly transferred actually required significant vocational adjustment when compared to [her] prior work." Pl.'s Br. 4. But the ALJ failed to see this because he "intentionally decided not to fully develop the record." Id. at 5. Plaintiff bases her argument on the fact that when the VE asked the ALJ if he wanted the VE to state the DOT codes corresponding to Plaintiff's past work as a case manager and counselor, the ALJ answered, "No, that's fine." (R. at 91-92.) She also notes that the SSA used a "fictitious" DOT code for her case manager position.[6] Pl.'s 5 (citing R. at 140, 149, 163). Thus, Plaintiff argues, the ALJ could not have possibly met his burden in demonstrating that Arthur's prior work skills were transferable to other work that required little, if any, vocational adjustment. Id. at 5-6. In other words, without the DOT codes corresponding to Plaintiff's prior work, the ALJ could not fully assess Plaintiff's past relevant work and thus the transferability of her acquired skills. Id. at 5-6. Plaintiff then identifies four possible DOT listings corresponding to her prior work, compares each's requirements to those of the information clerk and appointment clerk DOT descriptions, and concludes that her prior work skills are not transferable thereto. Id. at 6-8.

---

[6] The DOT code listed by the SSA in the record for case manager is 195.167-050. (R. at 140, 149, 163.) However, no DOT code presently exists. The correct DOT code for the case manager appears to be DOT 195.107-010, which is listed as "caseworker." (See R. at 91 ("[T]he case manager job comes under case worker in the DOT.").)

Despite Plaintiff's arguments, I conclude that substantial evidence supports the ALJ's transferability analysis and his conclusion that Plaintiff could perform the identified jobs of information clerk and appointment clerk with little, if any, vocational adjustment. First, Plaintiff cites no regulatory or case authority for her contention that the ALJ must have the DOT codes of the claimant's past relevant work in order to determine the transferability of the claimant's acquired work skills to other jobs. To the contrary, "[i]n evaluating the skill level of [past relevant work] . . ., work activities are the determining factors." SSR 82-41, 1982 WL 31389, at *3 (emphasis added). To that end, "[t]he claimant is in the best position to describe what he or she did in [past relevant work], how it was done, what exertion was involved, what skilled or semiskilled work activities were involved, etc. Neither an occupational title by itself nor a skeleton description is sufficient." Id. at *4. Although the ALJ may utilize occupational reference sources in determining the claimant's acquired work skills, he is not required to do so. Id.

The record in this case involves evidence and testimony from Arthur concerning her past relevant work and the nature of her duties. (R. at 62-69, 309-10.) The VE testified that the information Arthur provided was sufficient for him to classify her past work, identify her acquired work skills, and opine on the transferability of skills as the work was actually performed. (R. at 69, 99-100.) The VE stated that both of Arthur's prior jobs were considered "sedentary, skilled, SVP 7," but the VE defined them light as performed due to Arthur's fieldwork. (R. at 91-92.) Next, the VE identified the following transferable skills: counseling skills, communication skills, some problem resolution skills, basic computer skills, office skills and procedures, report writing and record keeping. (R. at 100.)

Then the ALJ specifically asked the VE to identify any semiskilled or skilled jobs in the national economy that "Arthur might be able to hypothetically perform in which her actual past

22

works skills would be sufficient to permit the new jobs with no more than very little, if any adjustment in terms of tools used, work processes, work settings or industry standards." (R. at 99.) In response to the question, the VE identified information clerk (sedentary, semiskilled, SVP 4) and appointment clerk (sedentary, semiskilled, SVP 3). (R. at 100.)

In his written opinion, the ALJ properly relied on the VE's testimony in both respects. And in arriving at his conclusion, the ALJ complied with all pertinent regulations and agency rulings. Accordingly, I find that substantial evidence exists in the record to support the ALJ's finding that, given Arthur's age, education, work experience, and RFC, a significant number of jobs exist in the national economy that Arthur could perform with little, if any, vocational adjustment.

## B.    Appointments Clause Challenge

Finally, relying on the Supreme Court's recent decision in Lucia v. SEC, 138 S. Ct. 2044 (2018), Arthur claims the ALJ who rendered the administrative decision is an "inferior officer," whose appointment was required to comply with the Appointments Clause. U.S. Const. art. II, § 2. Pl.'s Br. 8-12.  And because the ALJ was not appointed by the Commissioner, the department head, she seeks remand for a new administrative hearing. Id. at 8-12.  The Commissioner responds that Plaintiff forfeited this claim for failure to raise it at any point during the administrative proceedings. Def.'s Mem. 17-25.  Arthur does not contest that she did not raise an Appointments Clause challenge at any point during the administrative proceedings.

The court need not go into great detail to dispose of this claim because multiple judges of this court have addressed this issue exhaustively in several recent cases.  These opinions have unanimously held that the failure to raise the Appointments Clause challenge in the administrative proceedings operates as a waiver, forfeiting review in federal court. See Diane S.P. v. Berryhill, 379 F. Supp. 3d 498, 517-30 (E.D. Va. 2019); Bennett v. Berryhill, No. 2:17-cv-520, 2019 WL

1104186, at *7-11 (E.D. Va. Feb. 15, 2019), R. & R. adopted, 2019 WL 1102203 (E.D. Va. Mar. 8, 2019); Edwards v. Berryhill, No. 3:18-cv-615, 2019 WL 2619542, at *3-5 (E.D. Va. June 6, 2019), R. & R. adopted, 2019 WL 2620005 (E.D. Va. June 26, 2019); Lee v. Berryhill, No. 2:18-cv-214, 2018 WL 8576604 (E.D. Va. Dec. 20, 2018) R. & R. adopted, 2019 WL 1299366 (E.D. Va. Mar. 21, 2019).  Absent contrary authority from the Fourth Circuit, these cases illustrate that Plaintiff's reliance on Lucia is misplaced.[7]  See, e.g., Diane S.P., 379 F. Supp. 3d at 521.

There is no dispute that Arthur never challenged the propriety of the ALJ's appointment at any point during the administrative proceedings.  And she has identified no proper basis on which to excuse her failure to do so.  See id. at 526-28.  Accordingly, she has forfeited that claim.

### V.      Conclusion and Recommendation

For the foregoing reasons, I conclude that the ALJ's finding of no disability is supported by substantial evidence in the record, and that Arthur has forfeited her Appointments Clause challenge.  Accordingly, I recommend that the court GRANT the Commissioner's Motion for Summary Judgment, ECF No. 18, DENY Arthur's Motion for Summary Judgment, ECF No. 16, and DISMISS the case.

### VI.      Review Procedure

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

---

[7] Plaintiff's reliance on SSR 19-1p is similarly misplaced.  See Pl.'s Br. 10.  That ruling relates to how the SSA "will adjudicate cases pending at the Appeals Council in which the claimant has raised a timely challenge to the appointment of an [ALJ] under the Appointments Clause" in light of Lucia.  2019 WL 1324866, at *1 (Mar. 15, 2019).  More specifically, the Appeals Council will grant review to claimants that have (1) timely requested Appeals Council review, and (2) "raise[d] before us (either at the Appeals Council level, or previously had raised at the ALJ level) a challenged under the Appointments Clause to the authority of the ALJ who issued the decision or dismissal in the case."  Id. at *3.  But as explained above, Arthur never raised the Appointments Clause challenge before the SSA.  Thus, SSR 19-1p is inapposite.

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.      A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations.  Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
June 3 , 2020